**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re:

SEAN M. DUNN

                        Debtor.
------------------------------------------------------------------x

Chapter 7

Case No. 18-36566 (KYP)

## MEMORANDUM DECISION AND ORDER (1) EXCLUDING TESTIMONY OF BRANDON LANG, CPA, AND (2) DENYING DEBTOR'S MOTION TO HOLD LAK3, LLC IN CIVIL CONTEMPT

**APPEARANCES:**

CARLOS J. CUEVAS, ESQ.
*Counsel for the Debtor*
1250 Central Park Avenue
Yonkers, New York 10704

KIRBY AISNER & CURLEY LLP
*Co-Counsel for LAK3, LLC*
700 Post Road
Suite 237
Scarsdale, New York 10583
By:     Julie Cvek Curley, Esq.
                Of Counsel

AMINI LLC
*Co-Counsel for LAK3, LLC*
131 West 35th Street, 12th Floor
New York, New York 10001
By:     Avery Samet
                Of Counsel

**HONORABLE KYU YOUNG PAEK**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

LAK3, LLC ("LAK3") sued Sean M. Dunn ("Debtor") in state court asserting that the Debtor breached its contract to construct a multi-million-dollar residence in Lake Mahopac, New York and commenced an adversary proceeding in this Court seeking a determination that its claim was non-dischargeable. After years of litigation, the parties entered into a settlement in March 2022, under which the Debtor agreed to pay LAK3 $260,000.00 over five years. As part of the settlement, LAK3 agreed to file corrected IRS Form 1099-MISC (each, a "1099") to amend 1099s it had previously issued to the Debtor so that the corrected 1099s would reflect zero income from LAK3. LAK3 filed corrected 1099s for tax years (each, a "TY") 2016 and 2017, but IRS records indicated that LAK3 had also issued a 1099 to the Debtor for TY 2019 reporting income of $322,868. The parties argued about whether LAK3 had issued a 1099 to the Debtor for TY 2019, and LAK3 finally filed a corrected 1099 for TY 2019 in November 2024. According to the Debtor, the over-two-year delay in correcting the 1099 for TY 2019 resulted in his suffering substantial damages.

The instant dispute centers around whether LAK3 actually issued a 1099 to the Debtor for TY 2019. The Debtor contends that LAK3 did, in fact, issue the 1099 and now moves to hold LAK3 in civil contempt for failing to timely correct that 1099 as required under the settlement ("Contempt Motion").[1] LAK3 opposes the Contempt

---

[1]     *See Debtor's Motion to Hold LAK3, LLC in Civil Contempt*, docketed on April 9, 2025 ("Debtor Brief") (ECF Doc. # 114-1); *see also Reply Memorandum of Law of Mr. Sean M. Dunn in Support of Motion to Hold LAK3, LLC in Civil Contempt*, docketed on May 22, 2025 ("Debtor Reply") (ECF Doc. # 121-19). "ECF Doc. # _" refers to documents filed on the electronic docket of the Debtor's bankruptcy case. "ECF Adv. Pro. Doc. # _" refers to documents filed on the electronic docket of the Adversary Proceeding (defined *infra*). "ECF p. _" refers to the page number imprinted across the top of the page by the Court's electronic filing system.

Motion maintaining that it did not issue the 1099[2] and moves *in limine* ("Motion in Limine")[3] to exclude the testimony of the Debtor's expert, Brandon Lang, C.P.A. ("Lang"); the Debtor opposes the Motion in Limine.[4]

To hold a party in civil contempt, the movant must, among other things, present "clear and convincing" evidence that the alleged contemnor violated a Court order. Based on the evidence presented here, the Debtor has failed to satisfy the heightened burden of proof to establish that LAK3 issued a 1099 to the Debtor for TY 2019. For the reasons set forth herein, the Motion in Limine is GRANTED, and the Contempt Motion is DENIED.

## <u>JURISDICTION</u>

This Court has jurisdiction over the Motions pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* (M-431), dated January 31, 2012 (Preska, C.J.), referring bankruptcy cases and proceedings to the Bankruptcy Judges of the Southern District of New York. This is a core proceeding under 28 U.S.C. § 157(b)(2). This Court has jurisdiction to interpret and enforce the Settlement Order (defined *infra*). *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.").

---

[2]  *See LAK3, LLC's Opposition to the Debtor's Motion to Hold LAK3, LLC in Civil Contempt*, dated May 21, 2025 ("LAK3 Brief") (ECF Doc. # 120).

[3]  *See Motion in Limine of LAK3 LLC to Exclude Testimony of Debtor's Purported Expert Brandon Lang*, dated June 18, 2025 ("LAK3 MIL Brief") (ECF Doc. # 126); *see also Reply Memorandum of Law in Further Support of Motion in Limine*, dated July 16, 2025 ("LAK3 MIL Reply") (ECF Doc. #130).

[4]  *See Sean M. Dunn's Memorandum of Law in Opposition to the Motion in Limine of LAK3, LLC*, docketed on July 9, 2025 ("Debtor MIL Brief") (ECF Doc. # 128-19).

## BACKGROUND[5]

### A.    The Litigation Among the Parties and the Settlement

In May 2016, LAK3 engaged the Debtor and his brother, Gerald Dunn, to demolish an existing single-family residence and to construct a new multi-million-dollar luxury residence in Lake Mahopac, New York.  (First Dunn Declaration ¶ 5; Kleinschmidt Declaration ¶ 4.)  A dispute arose among the parties during construction

---

[5]    The Court reviewed the following declarations submitted by the parties as well as exhibits appended thereto:

- *Declaration of Carlos J. Cuevas, Esq.*, signed on Apr. 7, 2025 ("First Cuevas Declaration") (ECF Doc. # 114);

- *Declaration of David T. Azrin, Esq.*, signed on Feb. 27, 2024 ("Azrin Declaration") (ECF Doc. # 114-7);

- *Declaration of Sean M. Dunn in Support of the Motion to Hold LAK3, LLC [in] Civil Contempt*, signed on Mar. 31, 2025 ("First Dunn Declaration") (ECF Doc. # 114-12);

- *Declaration of Brandon Lang, C.P.A.*, signed on Mar. 31, 2025 ("First Lang Declaration") (ECF Doc. # 114-17);

- *Declaration of Ned Kleinschmidt in Support of the Opposition filed by LAK3, LLC to the Debtor's Motion to Hold LAK3, LLC in Civil Contempt*, signed on May 21, 2025 ("Kleinschmidt Declaration") (ECF Doc. # 120-1);

- *Reply Declaration of Carlos J. Cuevas, Esq. in Support of Motion to Hold LAK3, LLC in Civil Contempt*, signed on May 21, 2025 ("Second Cuevas Declaration") (ECF Doc. # 121-1);

- *Reply Declaration of Brandon Lang, C.P.A.*, signed on May 15, 2025 ("Second Lang Declaration") (ECF Doc. # 121-14);

- *Reply Declaration of Sean Dunn in Support of Motion to Hold LAK3, LLC in Civil Contempt*, signed on May 19, 2025 ("Second Dunn Declaration") (ECF Doc. # 121-17);

- *Reply Declaration of Jamie Dunn in Support of Motion to Hold LAK3, LLC in Civil Contempt*, signed on May 19, 2025 ("Jamie Dunn Declaration") (ECF Doc. # 121-18);

- *Declaration of Carlos J. Cuevas, Esq. in Opposition to Motion in Limine*, signed on July 6, 2025 ("Third Cuevas Declaration") (ECF Doc. # 128);

- *Declaration of Brandon Lang, C.P.A. in Opposition to the Motion in Limine*, signed on July 1, 2025 ("Third Lang Declaration") (ECF Doc. # 128-1); and

- *Declaration of Sean M. Dunn in Opposition to Motion in Limine*, signed on June 25, 2025 ("Third Dunn Declaration") (ECF Doc. # 128-10).

In addition, the Court reviewed the *Declaration of Jay A. Friedman*, signed on March 20, 2024 ("Friedman Declaration") (ECF Doc. # 98-2), which was submitted in connection with a prior matter in this case.

(First Dunn Declaration ¶ 5), and LAK3 terminated the relationship on June 19, 2017. (Kleinschmidt Declaration ¶ 6.)

On August 4, 2017, LAK3 commenced an action in the Supreme Court of the State of New York, Westchester County ("State Court"), styled *LAK3, LLC v. Sean Dunn, Gerald Dunn, and Well Dunn Maintenance & Contracting*, Index # 61510/2017 ("State Court Action"), asserting claims for fraud, breach of contract, breach of fiduciary duty, and lien law trust fund diversion.  (First Dunn Declaration ¶ 9; Kleinschmidt Declaration ¶ 7; *see also* First Dunn Declaration, Ex. B (docket of the State Court Action).)

On September 17, 2018, the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.  (ECF Doc. # 1.)  On November 21, 2018, LAK3 commenced an adversary proceeding styled *LAK3, LLC v. Sean M. Dunn*, Adv. Pro. No. 18-09038 seeking a finding that the debt owed to LAK3 was non-dischargeable under several subsections of 11 U.S.C. § 523(a) and for a denial of a bankruptcy discharge under 11 U.S.C. § 727(a)(3) ("Adversary Proceeding").  (*See* ECF Adv. Pro. Doc. # 1 (Adversary Proceeding complaint).)

After several years of litigation in the State Court Action and the Adversary Proceeding, and on the eve of trial in the State Court Action,[6] the parties entered into a settlement in March 2022 ("Settlement Agreement").[7]  (First Dunn Declaration ¶ 17.) The terms of the Settlement Agreement were as follows:

---

[6]    By Order dated March 22, 2019, this Court granted relief from the automatic stay to permit continuation of the State Court Action.  (ECF Doc. # 45.)

[7]    A copy of the Settlement Agreement is available at ECF Adv. Pro. Doc. # 115-1.

- The Debtor and Gerald Dunn will pay LAK3 the sum of $260,000.00 over a five-year period (Settlement Agreement § 1);

- The Debtor stipulates that the sum payable to LAK3 under the settlement is non-dischargeable under the Bankruptcy Code (*id*. § 8);

- The settlement is secured by confessions of judgment to be held by LAK3's counsel until full payment of the settlement amount by the Debtor and Gerald Dunn (*id*. §§ 3, 5, 7); and

- Within ten business days of the settlement, the Debtor will file a motion under Federal Bankruptcy Rule 9019 seeking approval of the Settlement Agreement and dismissal with prejudice of the Adversary Proceeding (*id*. § 6).

Pertinent to the instant dispute, the Settlement Agreement also required LAK3 to withdraw 1099s it previously issued to the Debtor and his brother as follows:

> Upon payment of the Initial Payment, LAK3 . . . will withdraw the United States IRS 1099 forms that LAK3 issued in respect of [the Debtor and Gerald Dunn] within seven days of the Effective Date, and will take any reasonable steps to resolve the deficiency notice resulting from the 1099 forms.

(*Id*. § 2.)

The Debtor filed a motion to approve the Settlement Agreement on March 16, 2022 (ECF Adv. Pro. Doc. # 111), and the Court entered an order approving the Settlement Agreement on April 25, 2022.  (*Order Approving Settlement Among LAK3, LLC; Sean M. Dunn; and Gerald Dunn* ("Settlement Order") (ECF Adv. Pro. Doc. # 115).)

## B.    LAK3's Correction of the 1099s for TYs 2016 and 2017

LAK3 used the accounting firm of Perelson Weiner LLP to prepare and file tax forms.  (Kleinschmidt Declaration ¶ 13.)  In early 2020, LAK3 directed Perelson Weiner to prepare 1099s for TYs 2016 and 2017 based on amounts LAK3 paid to the Debtor and

his brother between June 2016 and March 2017.  (*Id.* ¶¶ 14-15.)[8]  On January 22, 2020,

Perelson Weiner sent the following to the IRS: (i) Form 1096 for TY 2016 enclosing

Form 1099-MISC of the Debtor and Gerald Dunn,[9] (ii) Form 1099-MISC for TY 2016 for

the Debtor and Gerald Dunn, each showing nonemployee compensation of $322,868.75,

(iii) Form 1096 for TY 2017 enclosing Form 1099-MISC of the Debtor and Gerald Dunn,

and (iv) Form 1099-MISC for TY 2017 for the Debtor and Gerald Dunn, each showing

nonemployee compensation of $97,545.36.[10]

After entering into the Settlement Agreement, LAK3 directed Perelson Weiner to

file corrected 1099s to the IRS.  On May 20, 2022, Perelson Weiner filed corrected

1099s for the Debtors and Gerald Dunn for TYs 2016 and 2017 to reflect zero income

from LAK3 for those years.  (*Id.* ¶ 18.)

## C.    The Parties' Correspondence Regarding the 1099 for TY 2019

On April 24, 2023, David Azrin, Esq. ("Azrin") (Debtor's counsel in the State

Court Action) sent an email to Michael Gordon, Esq. ("Gordon") (LAK3's counsel in the

State Court Action) stating that LAK3 had not corrected all 1099s previously issued to

the Debtor because the Debtor still showed income from LAK3:

> [The Debtor] advises me that the 1099 form which [LAK3] issued to [the
> Debtor] is still showing up as reported income.  It appears that [LAK3] has
> not withdrawn or corrected the 1099 form it issued with respect to [the
> Debtor], and has not taken any steps to resolve the deficiency notice, as

---

[8]    Ned Kleinschmidt – LAK3's sole shareholder and managing member – stated that he directed
Perelson Weiner to issue the 1099s "because it appeared to me, based on admissions made by Debtor and
his brother, and records I reviewed, that Debtor and his brother had received compensation from LAK3
for construction work that they had done for LAK3."  (Kleinschmidt Declaration ¶ 16.)  In total, LAK3 paid
the Debtor and his brother $840,828.22 between June 27, 2016 and March 11, 2017.  (*Id.* ¶ 14.)

[9]    A Form 1096 is used to transmit certain other tax forms to the IRS including Form 1099s.  *Major
v. Comm'r*, 89 T.C.M. (CCH) 1440, at *4 (T.C. 2005), *aff'd*, 224 F. App'x 686 (9th Cir. 2007).

[10]    The Form 1096 and 1099s for TY 2016 are attached as Exhibit 1 to the Kleinschmidt Declaration,
and the Form 1096 and 1099s for TY 2017 are attached as Exhibit 2 to the Kleinschmidt Declaration.

required by the specific terms of the [Settlement Order].  This is causing extreme hardship to [the Debtor] with respect to preparing his tax returns.[11]

Gordon responded the following day that LAK3 had corrected the 1099s for TY 2016 and 2017:

I'm not quite sure why [the Debtor] is still seeing reported income from LAK3.  LAK3's accountants at Perelson Weiner LLP confirm that they mailed corrected 1099 forms for 2016 and 2017 showing $0.00 compensation to [the Debtor] dba Well Dunn and Gerald Dunn dba Well Dunn on May 20, 2022, as required by the settlement agreement. Perelson Weiner also confirms that copies of the corrected 1099s were sent directly to the Dunns.[12]

Azrin sent a follow-up email to Gordon on July 20, 2023 acknowledging that LAK3 corrected the 1099s for TYs 2016 and 2017, "[b]ut it appears [LAK3] failed to correct the 2019 form."  Azrin's July 20 email attached the Debtor's IRS Wage and Income Transcript for TY 2019 ("2019 Tax Transcript"), which included a reference to a Form 1099-MISC for income paid by LAK3.  The 2019 Tax Transcript identified LAK3 as the "[p]ayer" and included LAK3's federal identification number and business address.  It reported that, in TY 2019, the Debtor received non-employee compensation from LAK3 in the amount of $322,868.00.[13]

Gordon responded to Azrin on July 31, 2023 stating that LAK3 did not issue a TY 2019 1099 for the Debtor:

LAK3 never issued a 1099 to [the Debtor] or Gerald Dunn for TY 2019, as the enclosed letter from Gerald Dunn confirms.  Nor would it have made

---

[11]    The April 24 email from Azrin is attached as Exhibit 1 to the Azrin Declaration.

[12]    The email chain containing the April 25 email from Gordon is attached as Exhibit 2 to the Azrin Declaration.

[13]    The July 20 email from Azrin attaching the 2019 Tax Transcript is attached as Exhibit 2 to the Azrin Declaration.

sense for LAK3 to issue a 1099 for TY 2019, as the parties were deep in
litigation at that point and no work had been [sic] by the Dunns, and no
monies had been paid to the Dunns, after 2017, when the Dunns' contract
was terminated.  Although we cannot be certain, it appears to us that the
IRS erroneously attributed 2016 income to 2019.  I suggest your client
address that matter directly with the IRS, as Gerald apparently did.  There
is nothing that we can or are required to do about the IRS mistake, as
LAK3 did not issue, and therefore cannot withdraw, a 1099 for TY 2019.[14]

Azrin responded to Gordon on October 16, 2023 requesting that LAK3 correct the TY

2019 1099 as it had done with the 1099s for TYs 2016 and 2017:

[The Debtor] advises that the IRS is insisting that LAK3 reported that
income in 2019, and that it is not an IRS mistake, and that LAK3 needs to
submit a 2019 1099 showing zero, same as they did the other years. . . .
Can you please arrange for LAK3 to submit a 2019 1099 for [the Debtor]
showing zero?  As I indicated previously, your April 2023 email and the
documents you previously provided showed LAK3 issued corrected 1099
forms for the years 2016 and 2017.  But it appears it failed to correct the
2019 form, in direct violation of the [Settlement Order].[15]

Gordon responded on October 30, 2023 reiterating that LAK3 never issued a 1099 for

TY 2019:

LAK3 did not issue a 1099 to [the Debtor] or, for that matter, Gerald Dunn
or any Well Dunn business for tax year 2019.  Indeed, by that time, [the
Debtor], Gerald and Well Dunn had been fired from the LAK3 job.  Since
no 1099 was ever submitted by LAK3 for tax year 2019, there is no 1099
for LAK3 to correct.  Of course, if the Internal Revenue Service, the New
York State Department of Finance, or any other taxing authority were to
have questions for LAK3 about your client and his receipt of monies from
LAK3, rest assured those inquiries will be answered fully and completely.

---

[14]    The email chain containing the July 31 email from Gordon is attached as Exhibit 4 to the Azrin
Declaration.  The letter from Gerald Dunn referenced in Gordon's email is a letter dated September 9,
2021 in which Gerald demanded that LAK3 notify the IRS that it had reported TY 2019 income to Gerald
in error.  (ECF Doc. # 135 at ECF p. 2 (copy of Gerald Dunn's letter).)  According to a declaration
submitted by Gordon earlier in this case, Gordon informed Gerald's attorney that LAK3 did not issue a TY
2019 1099 for Gerald and that Gerald should contact the IRS to fix the apparent clerical mistake.
(*Declaration of Michael R. Gordon*, signed on March 21, 2024 ¶¶ 18-19 (ECF Doc. # 98-7).)  Gordon was
informed by Gerald's attorney in March 2024 that Gerald and his wife resolved the issue directly with the
IRS by explaining that LAK3 paid nothing to Gerald in TY 2019.  (*Id.* ¶¶ 20-23.)

[15]    The October 16 email from Azrin is attached as Exhibit 4 to the Azrin Declaration.

But until any such official inquiry is made, we have nothing further to provide on this matter.[16]

The parties reached an impasse on January 29, 2024.  Azrin sent a "final demand" that LAK3 file a corrected 1099 for TY 2019, failing which the Debtor would file a motion to enforce the Settlement Order against LAK3 and for damages.[17]  Gordon replied by letter later that day stating that "LAK3 cannot and will not 'file a corrected 1099 form for 2019,' as no such form exists to correct."[18]

### D.    The IRS Discovery and LAK3's Correction of the 1099 for TY 2019

The following month, the Debtor moved to reopen his bankruptcy case to prosecute the Contempt Motion, which the Court granted over LAK3's objection. (*Order Reopening Bankruptcy Case*, dated Apr. 3, 2024 (ECF Doc. # 102).)  Each party then moved to obtain discovery from the IRS pursuant to Federal Bankruptcy Rule 2004,[19] and the Court granted both applications.  (ECF Doc. ## 107, 110.)  LAK3 and the Debtor served the IRS with the Rule 2004 orders and received computer-generated summaries akin to the 2019 Tax Transcript reporting that LAK3 had issued a 1099 to the Debtor for TY 2019 showing income of $322,868.00.  (*See, e.g*., First Cuevas Declaration, Ex. H.)  The IRS, however, did not produce the original Form 1096 or Form 1099 that LAK3 issued for TY 2019.  Instead, in a September 24, 2024 letter to LAK3's

---

[16]    The October 30 email from Gordon is attached as Exhibit 8 to the Azrin Declaration at ECF p. 84.

[17]    The January 29 email from Azrin is attached as Exhibit 6 of the Azrin Declaration.

[18]    A copy of the January 29 letter from Gordon is attached as Exhibit 8 to the Azrin Declaration.

[19]    Rule 2004 of the Federal Rules of Bankruptcy Procedure provides that, "[o]n a party in interest's motion, the court may order the examination of any entity."  FED. R. BANKR. P. 2004(a).  Under Rule 2004, the movant may seek discovery on "(A) the debtor's acts, conduct, or property; (B) the debtor's liabilities and financial condition; (C) any matter that may affect the administration of the debtor's estate; or (D) the debtor's right to a discharge."  FED. R. BANKR. P. 2004(b)(1).

counsel ("IRS Letter"), the IRS stated that it no longer had the original forms due to the

IRS's document retention policy:

> This is in response to the subpoena issued in the case titled "US Bankruptcy Court Southern Dist. Of NY – Sean Dunn (Debtor)", received in our office on April 24, 2025, and my discussions with Counsel Attorney Nicole Vanderveer regarding your request for copies of Form 1096 and Form 1099 issued by LAK 3.

> Previously we sent you a letter dated May 24, 2024 . . . which included transcripts of Form 1099-MISC and Summary issued by your client for tax year 2019, documents enclosed.

> Per our procedures once the information from Form 1096 and 1099's is entered into our electronic system the paper documents are destroyed, therefore we do not have the original documents or copies of those documents.[20]

On November 6, 2024, LAK3 filed a corrected TY 2019 1099 for the Debtor

showing that zero income was paid by LAK3. (First Cuevas Declaration, Ex. J;

Kleinschmidt Declaration ¶ 28.) According to LAK3, it filed "a 'Corrected' Form 1099

for tax year 2019 so that the IRS could use the form to correct the erroneous entries

inputted into its electronic system." (Kleinschmidt Declaration ¶ 29.) LAK3's managing

member states that "[a]t no time did I or anyone else on behalf of LAK3 ever direct

Perelson Weiner or any other person or entity to issue an IRS Form 1099 to Debtor or

any person or business connected to Debtor on behalf of LAK3 for tax year 2019." (*Id.* ¶

17.) One of the Perelson Weiner partners in charge of LAK3 tax filings similarly states

that "at no time did I or anyone else at Perelson Weiner ever issue an IRS Form 1099 to

Debtor or any person or business connected to Debtor on behalf of LAK3 for Tax Year

2019." (Friedman Declaration ¶ 4.)

---

[20]    A copy of the IRS Letter is attached as Exhibit I to the First Cuevas Declaration.

**E.      The Contempt Motion and the Motion in Limine**

On April 9, 2025, the Debtor filed the instant Contempt Motion asserting that the

Debtor suffered damages as a result of LAK3's failure to timely correct the Debtor's TY

2019 1099.  (Debtor Brief ¶¶ 1-7.)  According to the Debtor, the Settlement Agreement

clearly required LAK3 to correct the Debtor's TY 2019 1099, the IRS records plainly

show that LAK3 in fact issued the 1099, and LAK3 failed to diligently comply with the

Settlement Agreement by refusing to file a corrected 1099.  (*Id.* ¶¶ 79-115.)  The Debtor

argues that LAK3 should be held in civil contempt for its violation of the Settlement

Agreement, and be ordered to pay, *inter alia*, the Debtor's professional fees and

emotional distress damages.  (*Id.* ¶¶ 130-190; First Dunn Declaration ¶¶ 40-93.)

The Debtor submitted the First Lang Declaration as expert testimony in support

of his Contempt Motion.  Lang is a certified public accountant with six years of

experience in the accounting field.  (First Lang Declaration ¶¶ 2, 3.)  Lang opined that:

- LAK3 issued the TY 2019 1099 to the Debtor because it is not the practice of the
  IRS to independently issue 1099s (*id.* ¶¶ 8, 9, 11-16);

- LAK3 had a practice of issuing erroneous 1099s because it corrected 1099s issued
  to the Debtor in 2016, 2017, and 2019 (*id.* ¶ 17); and

- The issuance of an erroneous 1099 is disastrous because the recipient is
  responsible for taxes on the non-existent income as well as applicable interest,
  penalties, liens, and levies.  (*Id.* ¶ 18.)

LAK3 filed its opposition to the Contempt Motion on May 21, 2025.  LAK3 argues

that the Settlement Agreement did not require LAK3 to correct 1099s it did not issue,

the evidence shows that LAK3 did not issue a TY 2019 1099 to the Debtor, and LAK3

ultimately decided to file a corrected TY 2019 1099 as a matter of good faith.  (LAK3

Brief ¶¶ 25-42.)

The Debtor filed a reply in further support of the Contempt Motion on May 22, 2025. (*See* Debtor Reply.)  In connection with his reply, the Debtor submitted the Second Lang Declaration, in which Lang reiterated that the IRS does not independently issue 1099s (Second Lang Declaration ¶ 3), and added that:

- LAK3 acted unreasonably by failing to timely file a corrected TY 2019 1099 for the Debtor (*id.* ¶ 2);

- If LAK3 did not issue a TY 2019 1099 for the Debtor, it should have immediately notified the IRS that another party fraudulently issued an erroneous 1099 (*id.* ¶ 6);

- LAK3's issuance of a *corrected* TY 2019 1099 for the Debtor is an admission that it previously issued an *original* TY 2019 1099 for the Debtor (*id.* ¶ 8); and

- The IRS's collection efforts could expose a person to significant emotional distress.  (*Id.* ¶¶ 11-12.)

The Court held oral argument on May 28, 2025.[21]  At the hearing, the parties and the Court established a briefing schedule on a motion by LAK3 *in limine* to preclude Lang's testimony.  (Hr'g Tr. at 29:18-34:8.)  The Court also stated that it would first decide the gating issue of whether LAK3 violated the Settlement Agreement before moving on to the issue of contempt and the Debtor's damages.  (*Id.* at 31:25-32:11.)

## DISCUSSION

In the sections that follow, the Court will first address LAK3's Motion in Limine and then the Debtor's Contempt Motion.

---

[21]    The transcript of the oral argument is available at ECF Doc. # 125, and references to the transcript will be denoted at "Hr'g Tr. at __:__."

A.    **Motion in Limine**

1.    **Applicable Legal Standards**

"The purpose of an in limine motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quoting *Banque Hypothecaire du Canton de Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987)).  The party offering the expert carries the burden of establishing the requirements imposed by Rule 702 of the Federal Rules of Evidence,[22] and the Court acts as a "gatekeeper" to ensure that the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Teachers' Ret. Sys. of La. v. Pfizer, Inc.* (*In re Pfizer Inc. Sec. Litig.*), 819 F.3d 642, 658 (2d Cir. 2016) (citation omitted).  The Court enjoys "broad discretion" in carrying out this gatekeeping function. *Id.*  "To determine whether a proposed expert's testimony passes muster under Rule 702, this

---

[22]    Federal Evidence Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

    (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)  the testimony is based on sufficient facts or data;

    (c)  the testimony is the product of reliable principles and methods; and

    (d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.

Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based on reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." *Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*, 574 F. Supp. 3d 197, 200-01 (S.D.N.Y. 2021) (quoting *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013)).

Rule 702 "requires a sufficiently rigorous analytical connection between the expert's methodology and conclusions." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of unreliable opinion testimony." *Nimely v. City of New York*, 414 F.3d 381, 396-97 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)); *accord Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (citation omitted).

Expert testimony should be excluded if it is speculative, conjectural or conclusory. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). An expert may not testify in the form of a factual narrative based on evidence about which he lacks personal knowledge. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016).

Expert testimony may not usurp "either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Nimely*, 414 F.3d at 397 (citation and internal quotation marks omitted). Last, expert testimony, like other evidence, is subject to the limitation set forth in Federal Evidence Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (citation and internal quotation marks omitted).

### 2.    Analysis

Lang's testimony, as set forth in his declarations, does not pass muster under Federal Evidence Rule 702. In the main, Lang concludes that LAK3 must have issued the TY 2019 1099 to the Debtor because the IRS does not independently issue 1099s. (First Lang Declaration ¶¶ 8, 9, 11-16; Second Lang Declaration ¶ 3.) This opinion is improper for at least two reasons. First, the opinion is devoid of analysis. Instead, Lang states in a conclusory fashion that his opinion is based on his knowledge of tax law. (*See* First Lang Declaration ¶ 11 ("Based upon my knowledge of the Internal Revenue Code and Regulations and the documents listed in Exhibit A, it is my professional opinion that LAK3, LLC issued the LAK3, LLC 2019 1099 Form to the Debtor."); *see also id.* ¶ 13 ("It is fundamental tax law and procedure that the IRS does not issue a 1099 form.").) He points out that his opinion is consistent with the Debtor's tax transcripts and summaries produced by the IRS (*id.* ¶ 16), but an average factfinder (here, the Court) is capable of reading and understanding the tax transcripts germane to this case without the assistance of an expert. (*See* 2019 Tax Transcript (showing that the Debtor earned $322,868.00 from LAK3 in TY 2019).) Second, Lang's opinion is unreliable. Although Lang is a CPA, he lacks knowledge of the IRS's administrative processes, including

whether it is possible for the IRS to make a clerical error, which is among LAK3's main contentions. Similarly, Lang's opinion that LAK3's eventual filing of a corrected TY 2019 1099 is an admission that it filed an original TY 2019 1099 (Second Lang Declaration ¶ 8) is improper. The assertion is conclusory, and he cites neither authority nor evidence to support this conclusion.

Lang's remaining opinions fare no better. Lang opines that LAK3 had a practice of issuing "erroneous" 1099s. (First Lang Declaration ¶ 17.) But whether LAK3 issued faulty 1099s is a factual matter, and whether LAK3 did so erroneously is a judgment to be made by the factfinder. Further, Lang concludes that LAK3 acted "unreasonably" by waiting to file a corrected 1099 for TY 2019. (Second Lang Declaration ¶ 2; *see also id.* ¶ 6 (opining that LAK3 should have "immediately notified" the IRS that another party had erroneously issued a 1099 to the Debtor).) The reasonableness of LAK3's actions is likewise a matter to be determined by the factfinder. *Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp.* N.V., 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) ("Whether a party acted with objective reasonableness is a quintessential common law jury question.").

Lang also opines that the Debtor suffered "emotional distress" because of the IRS's collection efforts. (Second Lang Declaration ¶ 12; *see also id.* ("The incessant collection pressure from the IRS could make the Debtor's life a living inferno . . . .").) But Lang, as a CPA, is not qualified to opine on the Debtor's emotional distress.

Based on the foregoing, LAK3's Motion in Limine is granted, and Lang's expert testimony is precluded.

**B.    Contempt Motion**

**1.    Applicable Legal Standards**

The Court has the inherent power to sanction a party to enforce compliance with its orders. *Worms v. Rozhkov* (*In re Markus*), 78 F.4th 554, 564 (2d Cir. 2023) (citations omitted). This authority is supplemented by 11 U.S.C. § 105(a), and relief to the affected party "must include the award of monetary and other forms of relief to the extent such awards are necessary and appropriate to carry out the provisions of the Bankruptcy Code and provide full remedial relief." *Solow v. Kalikow* (*In re Kalikow*), 602 F.3d 82, 97 (2d Cir. 2010) (quoting *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 445 (1st Cir. 2000)).

To demonstrate contempt, "a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d. Cir. 1995); *accord Taggart v. Lorenzen*, 587 U.S. 554, 557 (2019) ("[A] court may hold a creditor in civil contempt for violating a [bankruptcy court's] order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct.") (emphasis in original).

**2.    Analysis**

Initially, the provision in the Court-approved Settlement Agreement requiring LAK3 to correct 1099s previously issued to the Debtor is clear and unambiguous. "A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." *King*, 65 F.3d at 1058 (citations and internal

quotation marks omitted).  Here, section 2 of the Settlement Agreement required LAK3 to "withdraw the United States IRS 1099 forms that LAK3 issued in respect of [the Debtor and Gerald Dunn]" upon receipt of the initial settlement payment.  The Debtor and LAK3 understood the term "withdraw" to mean that LAK3 would file corrected 1099s reflecting that the Debtor and his brother made zero income from LAK3 for those years.  As such, LAK3 filed corrected 1099s for the Debtor and his brother for TY 2016 and 2017 to reflect zero income.

The crux of the dispute is whether LAK3 issued a TY 2019 1099 to the Debtor so that its failure to timely file a corrected TY 2019 1099 violated the Settlement Agreement.  As stated, proof of non-compliance must be "clear and convincing."  "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred."  *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (citation and internal quotation marks omitted).

The Debtor has failed to demonstrate to a reasonable certainty that LAK3 issued a TY 2019 1099 to the Debtor.  LAK3 maintains that it did not issue the TY 2019 1099 and theorizes that 2019 income was attributed to LAK3 due to a clerical error by the IRS.  Much of the record supports this conclusion.  Authorized representatives of LAK3 and its accounting firm Perelson Weiner have provided sworn testimony that they never issued a 1099 to the Debtor for TY 2019.  (Kleinschmidt Declaration ¶ 17; Friedman Declaration ¶ 4.)  Between April 2023 and January 2024, LAK3 attorney Gordon, after conferring with Perelson Weiner, consistently informed Debtor attorney Azrin that LAK3 did not issue a 1099 to the Debtor for TY 2019.  Indeed, while LAK3 issued 1099s to the Debtor for TYs 2016 and 2017 based on amounts paid to the Debtor by LAK3

19

between June 2016 and March 2017 for construction work (*see supra* note 8), by 2019 (i) more than a year had passed since LAK3 terminated its relationship with the Debtor in June 2017, and no payments of any kind were made by LAK3 to the Debtor in 2019 (Kleinschmidt Declaration ¶ 6); and (ii) the parties were actively litigating against each other in the State Court Action and the Adversary Proceeding.  (*Id.* ¶¶ 7, 10.)  In other words, there was no reason for LAK3 to have issued a 1099 to the Debtor for TY 2019.

After the Settlement Agreement was approved by the Court in April 2022, LAK3 promptly filed corrected 1099s for TYs 2016 and 2017.  (*Id* ¶ 9.)  Had LAK3 issued a 1099 for TY 2019, why would it risk violating the freshly inked Settlement Agreement by failing to file a corrected 1099 for that year?  It would be nonsensical for LAK3 to correct most, but not all, of the 1099s, and the Debtor has not identified any possible motive LAK3 would have had to do so.

The Debtor relies on the tax summaries and transcripts produced by the IRS, which show that LAK3 had issued a 1099 to the Debtor for TY 2019.  This is certainly probative evidence that LAK3 did issue a TY 2019 1099.  However, other evidence suggests that the 2019 income data was entered into the IRS system in error.  First, although the IRS Letter explained that it destroys paper copies of Form 1096s and 1099s that are submitted once the information is entered into the IRS electronic system, there is no explanation for why neither LAK3 nor the Debtor has a copy of this TY 2019 1099, if it existed.  Had LAK3 issued that 1099, LAK3 would have presumably sent a copy to both the Debtor and the IRS and likely retained a copy for its own records for a period of time.  But whereas both parties have submitted copies of the TY 2016 and 2017 1099s (as well as the Form 1096s transmitting those 1099s to the IRS), no party has produced any tax documents prepared by LAK3 reporting TY 2019 income to the IRS.

Second, the income amount reflected in the 2019 Tax Transcript – $322,868 – is almost exactly the same as the amount LAK3 reported in its original TY 2016 1099 issued to the Debtor – $322,868.75.  Based on the totality of the record here, it is just as likely that the IRS entered the same income number for two separate years, *i.e.*, 2016 and 2019, as it is that LAK3, after completing a TY 2016 1099 for the Debtor, proceeded to complete and submit an entirely separate 1099 for TY 2019 with the same income amount.

The Debtor's heavy reliance on the tax summaries and transcripts produced by the IRS rests on the assumption that the IRS does not make mistakes in entering tax data into its electronic system.  The IRS, like most organizations tasked with entering huge amounts of data, can, and sometimes does, make mistakes.  *See, e.g.*, *United States v. Frontone*, 383 F.3d 656, 657 (7th Cir. 2004) (IRS mistakenly issued a refund); *O'Bryant v. United States*, 49 F.3d 340, 341 (7th Cir. 1995) (IRS mistakenly credited a tax payment twice); *Stallard v. United States*, 12 F.3d 489, 492 (5th Cir. 1994) (noting that the IRS admitted it had "made a mistake in assessing a penalty"); *Scar v. Comm'r*, 814 F.2d 1363, 1365 (9th Cir. 1987) (an IRS employee used a wrong "code number" causing the IRS to assert an incorrect deficiency); *United States v. Tate & Lyle N. Am. Sugars, Inc.*, 162 F. Supp. 2d 236, 239 (S.D.N.Y. 2001) (due to a "processing error," the IRS mistakenly made an interest payment to the taxpayer); *Golden v. United States* (*In re Golden*), 641 B.R. 392, 396 (Bankr. E.D. Cal. 2022) (IRS confirmed that it had made mistake on a tax return).

Based on the evidence presented, the Court concludes that the Debtor has failed to meet his burden of presenting "clear and convincing" proof that LAK3 issued a TY 2019 1099 to the Debtor.[23]

## **ORDER**

For the reasons stated,[24] it is

**ORDERED** that LAK3's Motion in Limine is GRANTED; and it is further

**ORDERED** that the Debtor's Contempt Motion is DENIED.

Dated:     August 11, 2025
           Poughkeepsie, New York

                                   /s/ *Kyu Y. Paek*
                                   Honorable Kyu Y. Paek
                                   United States Bankruptcy Judge

---

[23]     Because the Debtor has failed to show clear and convincing evidence that LAK3 violated the Settlement Agreement, the Court need not address whether LAK3 has "diligently attempted to comply" with the Settlement Agreement.  *King*, 65 F.3d at 1058.

[24]     Arguments raised by the parties that are not specifically addressed in this Memorandum Decision and Order have been considered by the Court and rejected or rendered moot by the Court's rulings.